

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA



| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | FILED<br>MAR 2 1 2022<br>IN THIS OFFICE<br>Clerk U.S. District Court<br>Greensboro, N.C.<br>By |
| DARIUS RAYSHAUN KING,<br>    a.k.a. "Diddo,"<br>    a.k.a. "Ditto,"<br>    a.k.a. "LB,"<br>    a.k.a. "Lightbread,"<br>    a.k.a. "Quixk," | 1:22CR 75 |
| JHUSTYN KELVIN MITCHELL,<br>    a.k.a. "J-West,"<br>    a.k.a. "Big Wixked," | INDICTMENT |
| RICKY ALLEN WILLIAMS,<br>    a.k.a. "Raw," | SEALED |
| JACKII DEMETRIUSS FLOYD,<br>    a.k.a. "Boss," | 18 U.S.C. § 2 |
| SAQUAN LANARD ROUSE,<br>    a.k.a. "SQ,"<br>    a.k.a. "Playdoe," | 18 U.S.C. § 922(g)(1)<br>18 U.S.C. § 922(o)<br>18 U.S.C. § 924(c) |
| KENNETH MALIK WISE,<br>    a.k.a. "KG,"<br>    a.k.a. "Kenny,"<br>    a.k.a. "Big Psyxho," | 18 U.S.C. § 1512(a)<br>18 U.S.C. § 1959(a)(5)<br>18 U.S.C. § 1962(d)<br>21 U.S.C. § 841<br>21 U.S.C. § 846 |
| BRANDON DONTE TIPPS,<br>    a.k.a. "Tipps," | |
| JAQUAN TYREE WILLIAMS-<br>CLARK,<br>    a.k.a. "Jay Jay,"<br>    a.k.a. "JJ,"<br>    a.k.a. "Psyxho Jay,"<br>    a.k.a. "Demon," | |
| JALEN RASHAD FORD,<br>    a.k.a. "Pronto," | |

**JEREMY WAYNE HASTY,**
    a.k.a. "Seno,"
    a.k.a. "Seno2x,"
**JOSEPH MORANT TISDALE,**
    a.k.a. "Jody,"
    a.k.a. "Jody Wixked,"
**ROBERT LEE TOWNSEND, JR.,**
    a.k.a. "Jeezy,"
**TERRANCE GERNADO COLEMAN,**
    a.k.a. "Little T,"
    a.k.a. "T-Ruger,"

## THE GRAND JURY CHARGES:

### COUNT ONE
### (Racketeer Influenced Corrupt Organization (RICO) Conspiracy)
### (18 U.S.C. § 1962(d))

The Grand Jury for the Middle District of North Carolina charges that:

### I.   Introductory Allegations

1. At all times relevant to this Indictment, in the Middle District of North Carolina and elsewhere, **[1] DARIUS RAYSHAUN KING, a.k.a. "Diddo," a.k.a. "Ditto," a.k.a. "LB," a.k.a. "Lightbread," a.k.a "Quixk," [2] JHUSTYN KELVIN MITCHELL, a.k.a "J-West," a.k.a. "Big Wixked," [3] RICKY ALLEN WILLIAMS, a.k.a. "Raw," [4] JACKII DEMETRIUSS FLOYD, a.k.a. "Boss," [5] SAQUAN LANARD ROUSE, a.k.a. "SQ," a.k.a. "Playdoe," [6] KENNETH MALIK WISE, a.k.a. "KG," a.k.a. "Kenny," a.k.a. "Big Psyxho," [7] BRANDON DONTE TIPPS, a.k.a. "Tipps," [8] JAQUAN WILLIAMS-CLARK, a.k.a. "Jay**

2

Jay," a.k.a. "JJ," a.k.a. "Psyxho Jay," a.k.a. "Demon," [9] JALEN RASHAD FORD, a.k.a. "Pronto," [10] JEREMY WAYNE HASTY, a.k.a. "Seno," a.k.a. "Seno2x," [11] JOSEPH MORANT TISDALE, a.k.a. "Jody," a.k.a. "Jody Wixked," [12] ROBERT LEE TOWNSEND, JR., a.k.a. "Jeezy," ███████ ███████████████████████████████ and others known and unknown to the Grand Jury, were members and associates of an organization engaged in, among other things, acts involving murder, drug trafficking, robbery, extortion, and witness tampering. At all relevant times, this organization, known the Quixk Nation ("QN") or Quixk Money Gang ("QMG") (hereinafter "QN/QMG"), operated in the Middle District of North Carolina and elsewhere. QN/QMG, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Sections 1961(4) and 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## II. QN/QMG Enterprise

1.    Nine Trey Gangsters ("NTG," "9TRE," "9TREY," or "93") is a subset of the United Blood Nation ("UBN"). With branch operations in several eastern and southern states, including North Carolina, NTG participates in the same criminal activities, and functions with the same set of purposes, hierarchy, rules, operations, terminology, and symbolism, as does the overall UBN. NTG traffics in narcotics, and

3

commits acts of violence, including murder and assault.

2.      NTG is further broken down into subset groups or "lines" and uses a ranking system, referred to as a "lineup" or "line," often disguised with code names to label the leadership and ranking structure. A typical NTG line includes the following positions or lineup, in order of seniority:

       a.      Godfather;

       b.      High;

       c.      Low;

       d.      Five Star General;

       e.      Four Star General;

       f.      Three Star General;

       g.      Two Star General;

       h.      One Star General; and

       i.      Soldier or Scrap.

3.      Within the Middle District of North Carolina, specifically, in the greater Greensboro region, multiple NTG lines exist and operate. These lines have been consolidated under the leadership of a single "High," and are collectively known as the Quixk Nation ("QN") or Quixk Money Gang ("QMG") (hereinafter "QN/QMG"). QN/QMG has adopted and follows, with some exceptions, the general rules, regulations, and structure of NTG.

4.      QN/QMG is broken down into various lines. These lines include, but are not limited to, the following:

4

a. the Bapo Line;

b. the Psyxho Line;

c. the Bully Line;

d. the Roll Line;

e. the Ugly Line; and

f. the Wixked Line.

5. In addition to sharing the same leadership/ranking structure as NTG, within QN/QMG, women, sometimes called "First Ladies," hold unique positions of authority. For example, a First Lady can be responsible for record keeping, covert communications, handling proceeds of illicit transactions, setting up narcotics transactions, and thwarting law enforcement detection by accepting responsibility for weapons and narcotics, and placing vehicles and properties in her name.

6. Like NTG, QN/QMG is governed by a set of 31 rules, commonly known as "The 31." The rules dictate behavioral norms and policies, as well as bar certain conduct, such as cooperating with law enforcement. The rules also set forth guidance for communications. The most common and accepted methods for communicating include the following:

a. Facetoface meetings;

b. social media and other internet-based platforms;

c. cellular telephones; and

d. smartphone applications.

7. As part of its operations, QN/QMG conducts meetings in order to

5

manage gang business and to settle internal and external disputes. Members discuss dues, rules, organizational strategies such as narcotics trafficking, recruitment, and hierarchy.

8.    To join QN/QMG, a prospective member must be introduced or sponsored by an existing QN/QMG, NTG, or UBN member or be introduced specifically by a high-ranking gang member, such as the "High" or a "Low." Upon being accepted by QN/QMG leadership, the prospective member participates in an initiation ritual wherein he or she is physically beaten for 31 seconds by QN/QMG, NTG, or UBN members. This is commonly referred to as being "jumped in." Thereafter, the newly minted QN/QMG member is provided with gang materials and history, such as "The 31." Alternatively, a prospective member can forego the physical beating and nonetheless still become a QN/QMG member if such person receives approval from a high-ranking QN/QMG member. This is commonly referred to as being "blessed in" or "flipped in." Members of other UBN sets can "flip in" to QN/QMG and retain the rank they held in their previous gang, under certain circumstances.

9.    Once admitted, new QN/QMG members are required to participate in criminal activities as directed by leadership. Such conduct includes, but is not limited to, narcotics distribution, firearms trafficking, property offenses, and acts of violence, including, but not limited to, murder and assault.

10.    When required, funds are collected from members for the benefit of NTG and QN/QMG enterprise. Historically, dues were collected on the 31st of each month

that ends in that date. These funds are commonly used to acquire cellular telephones for communication between members in and out of jail, to purchase narcotics for distribution, to procure firearms for use in violent crimes, to obtain the release of incarcerated members through bond payments, to send funds to the commissary accounts of incarcerated members, to provide loans to members, to provide funeral expenses of deceased members or associates, and for other gang-related purposes.

11. Like NTG, QN/QMG utilizes a variety of indicia to express allegiance to the gang, including, but not limited to, numbers, letters, colors, symbols, tattoos, clothing, slogans, terminology, hand gestures, and greetings. These indicia are employed to identify members to one another, to distinguish members from both rival and allied groups, and to intimidate and threaten rivals and law enforcement. For example, QN/QMG members commonly use the number five, the five-pointed star, the five-pointed crown, and the numbers nine and three to denote their membership in QN/QMG.

12. In addition, QN/QMG members and associates wear or otherwise employ the color red, and commonly wear clothing of professional sports franchises who wear red as one of their team colors. Bandanas are also commonly worn by QN/QMG members to signify that they are gang members. The bandana can be worn in a variety of ways on the body, but the common denominator is that the bandana is red.

13. To thwart scrutiny from law enforcement and avoid detection from rival gangs, QN/QMG members and associates employ coded terms to communicate. For

7

example, these terms include, but are not limited to, "Op" or "Ops," which refers to a rival gang member or target of violence, and "food," which has a dual meaning. If used in reference to violence, someone labeled as "food" or "being on a plate" refers to someone who is a target of violence. "Food" can also be a reference to different narcotics, depending on the context of the situation.

14. Similarly, QN/QMG members and associates employ certain written language, both in the form of code words and distinctive spelling, to denote QN/QMG membership. For example, members will often replace the letter "c" with an "x" or "b" as a show of disrespect to the Crips, a historical UBN rival. For instance, QN/QMG members generally spell the word "wicked" as "wixked."

15. To further distinguish itself, QN/QMG has adopted several different monikers, including, but not limited to Ugly Money Gang, or UMG; Paul Money Gang, or PMG; Bapo Route; Billy Bad Asses, or BBA; Big Xhip (Chip) Lineup; and variations thereof. Such identifiers are frequently found in the form of writings, clothing, apparel, jewelry, social media, music videos, and tattoos.

16. To obtain members, QN/QMG recruits within the local community, the surrounding areas, and the prison system. QN/QMG also frequently obtains members from rival gangs due to organizational disputes, incarceration, and financial motivations, among other reasons. This gang crossover and recruitment is also a source of ongoing disputes, and commonly results in acts of violence.

17. QN/QMG often recruits from, associates, and aligns forces with members of different groups for the common purpose of asserting QN/QMG authority,

8

protecting narcotics distribution networks, protecting proceeds of narcotics distribution, and engaging in proactive and retaliatory acts of violence. One of the groups in the Greensboro, North Carolina area that historically aligned and associated with QN/QMG is the Andrews Street Boys, also known by monikers such as "ASB" or "ASB 500" and the geographic area known as the "Dustbowl." Some QN/QMG members are also members of ASB.

18. Since its founding in the Greensboro, North Carolina area in or about 2012, QN/QMG has consistently expanded to include members and associates who are not UBN NTG Bloods in the traditional sense, but nonetheless have status or rank within QN/QMG. These members and associates, though not UBN NTG Bloods, must still abide by the rules and regulations of QN/QMG or risk discipline in the form of excommunication, getting "kicked out of the whip," or physical or monetary harm.

19. QN/QMG also has specific rival gangs that they compete with for status and power. These rivals can, at times, include other NTG or UBN subsets.

### The Purposes of the Enterprise

20. The purposes of QN/QMG enterprise include, but are not limited to, the following:

    a.    Maintaining, protecting, and expanding its power, territory, operations, reputation, and proceeds;

    b.    Developing, promoting, enhancing, and maintaining its leaders', members', and associates' illegal activities;

    c.    Generating, preserving, and protecting its leaders', members',

9

and associates' illegal proceeds;

d.    Enriching and financially assisting its leaders, members, and associates;

e.    Protecting its leaders, members, and associates from physical violence perpetrated by rivals;

f.    Keeping rivals, witnesses, informants, cooperating defendants, law enforcement, and the public-at-large in fear of its leaders, members, and associates;

g.    Concealing its leaders', members', and associates' involvement in illegal activities;

h.    Hindering, obstructing, and preventing law enforcement scrutiny of the criminal activities of its leaders, members, and associates;

i.    Supporting its leaders, members, and associates who were liable for, charged with, or incarcerated for, illegal activities; and

j.    Ensuring the overall safety, security, and prosperity of its leaders, members, and associates.

### The Means and Methods of the Enterprise

21.    The means and methods by which the leaders, members, and associates of QN/QMG enterprise conduct and participate in the conduct of the affairs of the enterprise include, but are not limited to, the following:

a.    Leaders, members, and associates create, implement, advance, promote, utilize, and enforce an organizational structure and

10

hierarchy;

b.     Leaders, members, and associates create, implement, advance, promote, utilize, and enforce various rules and regulations;

c.     Leaders, members, and associates meet regularly to, and use correspondence to, identify and discuss important issues, such as membership, disciplinary matters, criminal activities, and thwarting law enforcement scrutiny;

d.     Leaders, members, and associates use, and threaten to use, violence, such as murder and assault;

e.     Leaders, members, and associates procure, transport, store, conceal, package, protect, and distribute controlled substances;

f.     Leaders, members, and associates receive, transport, store, conceal, package, and transfer the illicit proceeds derived from illegal activities;

g.     Leaders, members, and associates procure, transport, store, maintain, carry, and employ various weapons, such as firearms and accompanying ammunition, to be used for protection, intimidation, and in the commission of crimes;

h.     Leaders, members, and associates conceal, alter, mutilate, and destroy evidence;

i.     Leaders, members, and associates use, expend, distribute, and otherwise employ financial resources to support one another in

11

various ways;

j.  Leaders, members, and associates utilize the internet, social media, smart phone applications, and messaging services to communicate, coordinate criminal conduct, display enterprise indicia, intimidate and threaten rivals, and thwart law enforcement scrutiny; and

k.  Leaders, members, and associates employ various methods of transportation to engage in interstate and foreign travel.

## III.  The Racketeering Conspiracy

22.  Beginning in or about 2012, and continuing to on or about the return date of this Indictment, in the Middle District of North Carolina and elsewhere, the defendants,

DARIUS RAYSHAUN KING,
a.k.a. "Diddo,"
a.k.a. "Ditto,"
a.k.a. "LB,"
a.k.a. "Lightbread,"
a.k.a. "Quixk,"

JHUSTYN KELVIN MITCHELL,
a.k.a. "J-West,"
a.k.a. "Big Wixked,"
RICKY ALLEN WILLIAMS,
a.k.a. "Raw,"

JACKII DEMETRIUSS FLOYD,
a.k.a. "Boss,"

SAQUAN LANARD ROUSE,
a.k.a. "SQ,"
a.k.a. "Playdoe,"

12

**KENNETH MALIK WISE,**
    a.k.a. "KG,"
    a.k.a. "Kenny,"
    a.k.a. "Big Psyxho,"

**BRANDON DONTE TIPPS,**
    a.k.a. "Tipps,"

**JAQUAN TYREE WILLIAMS-CLARK,**
    a.k.a. "Jay Jay,"
    a.k.a. "JJ,"
    a.k.a. "Psyxho Jay,"
    a.k.a. "Demon,"

**JALEN RASHAD FORD,**
    a.k.a. "Pronto,"

**JEREMY WAYNE HASTY,**
    a.k.a. "Seno,"
    a.k.a. "Seno2x,"

**JOSEPH MORANT TISDALE,**
    a.k.a. "Jody,"
    a.k.a. "Jody Wixked,"

**ROBERT LEE TOWNSEND, JR.,**
    a.k.a. "Jeezy,"

(collectively, "the defendants"), being persons employed by and associated with QN/QMG, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, together with others known and unknown to the Grand Jury, did intentionally and knowingly conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of QN/QMG enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5), which pattern of racketeering activity consisted of:

a.   multiple acts involving:

  1.  murder, in violation of North Carolina Gen. Stat. §§ 14-17,
       14-2.4, 14-2.5, and 14-5.2; and

b.   multiple offenses involving narcotics trafficking, in violation of
     21 U.S.C. §§ 841 (possession with the intent to distribute and
     distribution of controlled substances), 843(b) (use of
     communication facility in causing or facilitating the commission
     of felonies under the Controlled Substances Act), and 846
     (conspiracy to distribute controlled substances); and

c.   multiple acts indictable under:

  1.   18 U.S.C. § 1512 (relating to tampering with a witness,
        victim, or an informant); and

  2.   18 U.S.C. § 1513 (relating to retaliating against a witness,
        victim, or an informant).

23.    It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## IV.   Overt Acts

24.    In furtherance of the racketeering conspiracy and to achieve the object thereof, the defendants, together with others known and unknown to the Grand Jury, committed and caused to be committed various acts within the Middle District of North Carolina and elsewhere, including, but not limited to, the following:

14

a) Beginning in or about 2012 and continuing to the present, **KING**, **MITCHELL**, **WILLIAMS**, **FLOYD**, **ROUSE**, **WISE**, **TIPPS**, **WILLIAMS-CLARK**, **FORD**, **HASTY**, **TISDALE**, **TOWNSEND**, ███████ and TERRANCE GERNADO COLEMAN, conspired with each other, and others known and unknown to the Grand Jury, to knowingly and intentionally distribute and to possess with the intent to distribute controlled substances, including, but not limited to, heroin, fentanyl, hydrocodone, cocaine, crack cocaine, marihuana, MDMA, and analogue controlled substances.

b) On or about October 31, 2013, under his Facebook account username "Steven Bodkin," **KING** posted a photograph of **ROUSE** posing alone with a red bandanna around his neck. The caption of the photograph reads "Happy trey-1st."

c) On or about December 22, 2013, under his Facebook account username "Steven Bodkin," **KING** posted a picture of himself holding a paperbound copy of the "The Trey Way," a book authored by UBN/NTG Godfather Garland "S.I." Tyree.

d) On or about October 26, 2014, **ROUSE** gathered with QN/QMG members and associates at a vigil for a recently murdered QN/QMG member known within the enterprise as "EJ."

e) On or about October 26, 2014, **ROUSE** possessed a Remington .45 caliber firearm officers found during the search of a high-ranking QN/QMG gang member's car.

15

f)   On or about April 6, 2014, **MITCHELL** and S.C. possessed a Taurus .357 caliber pistol, a Smith & Wesson 9mm pistol, and marihuana outside Club Cabaret. **MITCHELL** was a convicted felon.

g)   On or about January 25, 2015, QN/QMG members and associates assaulted a rival gang member at the Great Stops Gas Station by punching and hitting him. On or about January 25, 2015, while driving away from the scene of the assault of rival gang member K.R., **ROUSE** possessed with the intent to distribute cocaine base. In addition, the car **ROUSE** was driving contained **KING's** North Carolina identification card, jail documents for **MITCHELL**, and a paperbound copy of "The Trey Way," a book authored by UBN/NTG Godfather Garland "S.I." Tyree.

h)   On or about October 29, 2015, under the Facebook account username "Jhustyn Mitchell," **MITCHELL** posted a picture of himself standing with **KING** and two other QM/QMG members. The caption to the post reads "100 BBA" or "Billy Bad Ass," a reference to QN/QMG/NTG association or membership.

i)   On or about November 12, 2015, **MITCHELL** brandished a firearm, and threatened and assaulted a female associate outside her home on Beck Street.

j)   On or about December 9, 2015, QN/QMG associate T.P. drove **MITCHELL**, **WISE**, and **WILLIAMS** to Beck Street to shoot rival gang member.

k)   On or about December 9, 2015, **MITCHELL**, **WISE**, and **WILLIAMS** murdered J.A.

l)   On or about December 9, 2015, **MITCHELL**, **WISE**, and

16

**WILLIAMS** attempted to murder K.W. and, while doing so, shot and critically injured K.W.

m)   On or about December 9, 2015, QN/QMG associate T.P. drove **MITCHELL**, **WISE**, and **WILLIAMS** away from Beck Street in a rental car after the murder of J.A. and the attempted murder of K.W.

n)   On or about December 9, 2015, QN/QMG associates T.P. and A.B. twice went to Walmart to purchase ammunition, clothes, and bleach for **MITCHELL** and **WISE** after the murder of J.A. and the attempted murder of K.W.

o)   On or about December 9, 2015, QN/QMG gang member S.A. went to the Regency Inn where **MITCHELL**, **WISE**, **WILLIAMS**, and other QN/QMG members and associates rented rooms to exchange the firearms **MITCHELL**, **WISE**, **WILLIAMS**, and QN/QMG associate T.P. used in the murder of J.A. and the attempted murder of K.W.

p)   On or about December 10, 2015, **MITCHELL** and **WILLIAMS** exchanged gun fire with rival gang member R.K. who was the intended target of the shooting on December 9, 2015, and who came to the Regency Inn in retaliation. QN/QMG associate S.M. was shot in the leg during the shootout.

q)   On or about December 10, 2015, following the shootout at the Regency Inn, QN/QMG associate A.B. was in a car with **WILLIAMS** and injured QN/QMG associate S.M., who had been shot in the leg during the exchange of gunfire at the hotel. A.B. had an S&W .40 caliber pistol, a Taurus .40 caliber pistol, and a Ruger 9mm pistol in her purse.

17

r) On or about December 11, 2015, **MITCHELL** was with a QN/QMG associate who possessed cocaine and a Taurus .45 caliber pistol.

s) On or about January 6, 2016, **WISE** possessed a Taurus .40 caliber chrome pistol with a pearl handled grip and took photographs of himself sitting on a bed with bulk cash spread out in front of him along with the firearm. Some of the same pictures seized from his phone were also posted on **WISE's** Facebook account, "KGTooHot." At the time the pictures were posted to Facebook and found on **WISE's** phone, he was a convicted felon.

t) On or about January 10, 2016, **KING**, **TISDALE**, **TIPPS**, and **WISE**, among other QN/QMG members and associates, congregated at 215 Berryman Street, in Greensboro, North Carolina.

u) On or about January 29, 2016, under his Facebook account username "Steven Bodkin," **KING** posted a picture of himself with the caption "First Night Back out I awhile #aktivebighomie."

v) On or about January 29, 2016, under his Facebook account username "KGTooHot," **WISE** posted a picture of himself with **KING** and other QN/QMG members in which **WISE** is throwing a QN/QMG gang hand sign.

w) On or about February 29, 2016, under his Facebook account username "Steven Bodkin," **KING** posted a picture of himself with **WISE** and another QN/QMG gang member. The caption to the post reads "Boolin Wit My Brothers BBA." **KING** and the other QN/QMG gang member are wearing red pants and **WISE** is making a common QN/QMG/NTG gang hand sign, which was also depicted in the

18

caption by an emoji.

x)  On or about March 2, 2016, a ranking QN/QMG member sold cocaine. During the sale, the QN/QMG gang member received the payment of gang dues as part of the purchase price.

y)  On or about May 1, 2016, in a car rented by **KING**, **WISE**, **FLOYD,** and QN/QMG member M.G., an occupant of the car discharged a firearm into a Chevrolet Camaro occupied by rival gang members J.F. and R.P.

z)  On or about May 1, 2016, during the shooting of J.F. and R.P., **WISE**, **FLOYD**, and QN/QMG member M.G. possessed a Springfield .40 caliber pistol and officers found a paper in the rental car that referenced the QN/QMG enterprise.

aa)  On or about May 1, 2016, **KING** came to scene of **WISE**, **FLOYD,** and QN/QMG member M.G.'s arrests and asked to take possession of the rental car used by **WISE**, **FLOYD,** and M.G. to commit the shooting.

bb)  On or about June 18, 2016, **KING**, QN/QMG member P.D., and QN/QMG associate R.J. possessed heroin. When arrested, **KING** and P.D. pressured R.J. to "man up and take their shit."

cc)  On or about June 18, 2016, **TIPPS** and another QN/QMG member possessed crack cocaine and a Glock 9mm pistol.

dd)  On or about July 21, 2016, **KING** sold approximately two ounces of crack cocaine.

ee)  On or about August 4, 2016, **KING** distributed approximately two ounces of crack cocaine.

19

ff)     On or about August 15, 2016, under his Facebook account username "Steven Bodkin," **KING** posted a picture of himself with QN/QMG gang member P.E. In the photo, QN/QMG member P.E. is holding a large stack of bulk cash to his ear. The caption to the post reads "MyHoodTreatMeLikeImELBapo."

gg)     On or about August 25, 2016, **ROUSE** distributed a drug represented to be "molly," a vernacular term for MDMA.

hh)     On or about September 8, 2016, QN/NTG members held a gang meeting at the home of QN/QMG member T.C.

ii)     On or about October 16, 2016, QN/NTG members held a gang meeting at the home of QN/QMG member T.C.

jj)     On or about January 22, 2017, **KING** and several QN/QMG members and associates participated in a fight, during which a police officer was struck with a tire iron and injured.

kk)     On or about March 1, 2017, **KING** visited NTG Godfather Pedro Gutierrez, a.k.a. "Magoo," a.k.a. "Light," in Wende Correctional Facility in Alden, New York.

ll)     On or about March 7, 2017, under his Facebook account username "Steven Bodkin," **KING** attached a photograph to a Facebook private message and delivered it to another QN/QMG associate. The picture depicted **KING** crouched with NTG Godfather Pedro Gutierrez, a.k.a. "Magoo," a.k.a. "Light."

mm)     On or about March 23, 2017, C.S. possessed jail writings that contained UBN/NTG history, structure, terms, and rules, and named "Ditto" **(KING)**

as the "High."

nn)     On or about April 19, 2017, G.N. possessed writings about UBN/NTG history, structure, terms, and rules. A list contained in the writings referenced **KING** as the "High" and referenced **MITCHELL** as one of **KING's** "Lows."

oo)     On or about May 9, 2017, a high-ranking QN/QMG gang member, armed with a handgun, and **FORD**, armed with a .223 caliber rifle, shot a woman while she was the passenger in a Ford Mustang. The victim sustained gunshot wounds to her hand, lower back, and left shoulder.

pp)     On or about May 23, 2017, **KING** possessed mail that listed his residence as 506 West Terrell Street, insurance documents for a 2003 Acura TL, charging documents for QN/QMG member L.M. that included the name of the victim, and a copy of the Final Presentence Investigation Report for QN/QMG gang member S.A.'s Middle District of North Carolina criminal case.

qq)     On or about June 12, 2017, shortly after **MITCHELL** was released from custody, **KING** was with **MITCHELL** and two other QN/QMG members and associates in a hotel room.

rr)     On or about August 10-17, 2017, **KING** organized a trip to Miami, Florida, with **TISDALE** and other QN/QMG members and associates.

ss)     On or about August 12, 2017, **FORD** sold approximately one gram of heroin.

tt)     On or about August 14, 2017, **FORD** sold approximately one

21

gram of crack cocaine.

uu)   On or about August 17, 2017, **FORD** was arrested in a buy-bust operation conducted by the High Point Police Department. At the time of his arrest, **FORD** possessed with the intent to sell approximately 1.25 grams of heroin.

vv)   On or about August 21, 2017, **KING** flew with three QN/QMG associates to Los Angeles, California, with over $163,000 in cash that was seized by law enforcement.

ww)   On or about October 17, 2017, **KING** filed articles of incorporation with the North Carolina Secretary of State for "Quickz Musik Group L.L.C." **KING** is the registered agent for the company, and the registered address for the company is a residence (506 West Terrell Street, Greensboro, North Carolina) **KING** used.

xx)   On or about November 27, 2017, **KING** authorized QN/QMG members and associates to locate and shoot rival G-Shine gang members. Rivals T.W., D.K., and D.P. all sustained gunshot wounds in a shooting on McConnell Road in Greensboro, North Carolina.

yy)   On or about January 24, 2018, **KING** possessed a Louis Vuitton handbag that contained **KING's** North Carolina identification card as well as a drug ledger accounting for over $2,000,000 in narcotics transactions involving **KING's** sources of supply and QN/QMG associates. **FLOYD** possessed a small, black personal notebook containing contact information for numerous QN/QMG members and associates. **FLOYD** possessed a Kel-Tec .32 caliber pistol at 2504 Dulaire Road, Greensboro, North Carolina, a home associated with **FLOYD** and his girlfriend.

zz) On or about April 18, 2018, **TIPPS** distributed approximately one ounce of heroin mixed with fentanyl.

aaa) On or about May 3, 2018, **KING** distributed approximately three ounces of heroin mixed with fentanyl to a QN/QMG gang member.

bbb) On or about May 22, 2018, **KING** received a partial payment for the heroin he provided to a QN/QMG gang member on or about May 3, 2018.

ccc) On or about May 22, 2018, **TIPPS** distributed approximately one ounce of heroin mixed with fentanyl.

ddd) On or about June 1, 2018, **KING** received a second payment for the heroin he provided to a QN/QMG gang member on or about May 3, 2018.

eee) On or about July 17, 2018, **KING** possessed with intent to distribute approximately 7.5 kilograms of heroin mixed with fentanyl and approximately 2.56 kilograms of fentanyl mixed with tramadol and dipyrone.

fff) On or about September 26, 2018, **WILLIAMS-CLARK** accompanied another QN/QMG member for a heroin deal. During the deal, **WILLIAMS-CLARK** got out of the car driven by the QN/QMG gang member and conducted counter-surveillance while the QN/QMG gang member sold a half ounce of heroin mixed with fentanyl.

ggg) On or about January 7, 2019, COLEMAN and another QN/QMG gang member saw a QN/QMG gang member at the state probation office on N. Spring Street in Greensboro.

hhh) On or about January 9, 2019, **FLOYD** directed that the

23

QN/QMG gang member COLEMAN saw at the state probation office two days before be "taken care of," or words to that effect ████████████████████████████ attempted to murder the QN/QMG gang member because they believed he was cooperating with law enforcement.

iii)     On or about March 7, 2019, **KING** called a meeting and ordered QN/QMG members to pay money toward the funeral services for deceased QN/QMG member M.S. a.k.a. Spazz. Thereafter, **KING** demoted **MITCHELL** from his rank of "Low" of QN/QMG Wixked Line to the rank of "flat" for his failure to contribute to the funeral expenses of M.S. in the days following the meeting.

jjj)     On or about April 24, 2019, **TISDALE** possessed with the intent to distribute heroin, cocaine, and suspected MDMA.

kkk)     On or about August 2, 2019, **KING** distributed approximately two ounces of heroin to four different QN/QMG members, including **HASTY**, for them to re-distribute for an upcoming trip to Las Vegas, Nevada.

lll)     On or about August 2, 2019, **HASTY** possessed with the intent to distribute heroin.

mmm)     On or about August 7, 2019, **KING** received payment for some of the heroin he distributed to four QN/QMG members on August 2, 2019. From on or about August 8, 2019, to on or about August 13, 2019, **KING, HASTY,** and other QN/QMG members and associates traveled to Las Vegas, Nevada, to celebrate **KING's** birthday.

nnn)     On or about September 6, 2019, **ROUSE** shot at and

24

attempted to murder a rival gang member. **ROUSE** believed the front seat passenger, was a rival gang member. Also in the car were a female driver and three minors.

ooo)     On or about September 16, 2019, **FLOYD** fired a .45 caliber pistol at unknown individuals in the parking lot of the Glenwood Recreation Center. The unknown individuals came to the Glenwood Recreation Center to target **KING**, who was playing basketball inside.

ppp)     On or about September 17, 2019, **KING**, **FLOYD**, **HASTY,** and other QN/QMG members and associates assembled to search for and retaliate against the individual(s) who shot at **KING** on September 16, 2019.

qqq)     On or about September 17, 2019, **HASTY** shot and injured victims L.R. and R.C. with a .223 caliber rifle while being driven by **KING** in **HASTY's** white Mercedes.

rrr)     On or about November 12, 2019, **FLOYD** possessed a Springfield .45 caliber pistol, heroin, marihuana, suspected MDMA, and cocaine. **FLOYD** was a convicted felon.

sss)     On or about December 14, 2019, **TOWNSEND** possessed with the intent to distribute approximately 3 grams of crack cocaine.

ttt)     On or about January 9, 2020, **HASTY** possessed with the intent to distribute marihuana and hydrocodone.

uuu)     On or about February 18, 2020, **KING**, with other QN/QMG associates, provided approximately $500,000 in cash to a drug courier.

vvv)     On or about March 2, 2020, COLEMAN possessed two

25

firearms delivered to him by QN/QMG gang members. **KING** instructed COLEMAN to hold onto them.

www)     On or about April 8, 2020, **TISDALE** and QN/QMG gang member C.L. possessed a Smith & Wesson .40 caliber pistol and **TISDALE** possessed marijuana.

xxx)     On or about April 9, 2020, after detecting law enforcement presence in the area of 804 Rockett Street in Greensboro, **KING** instructed COLEMAN to throw two large black bags of narcotics over the fence behind the house.

yyy)     On or about May 16, 2020, **KING**, along with now-deceased QN/QMG gang member, provided approximately $800,176 in cash to a drug courier. The packages of shrink-wrapped cash were marked by a five-pointed star written in red ink, a symbol and color commonly associated with QN/QMG/NTG members and associates.

zzz)     On or about June 16, 2020, **KING** and QN/QMG associates provided approximately $600,000-$800,000 in cash to a drug courier. The packages of cash were marked by a five-pointed red star.

aaaa)     On or about August 13, 2020, **TISDALE** possessed a stolen Ruger .45 caliber handgun.

bbbb)     On or about October 16, 2020, a now-deceased QN/QMG gang member lobbied **KING** and **FLOYD** for acknowledgement and increased rank after trying to shoot and kill rival gang member at New Glo carwash on Randleman Road in Greensboro. During the shooting, the deceased QN/QMG gang member fired

an "FN" .40 caliber firearm into the rival gang member's car while it was being washed. The rival gang member's juvenile child was in the front passenger seat of the car at the time of the shooting. .

cccc)     On or about October 26, 2020, **TOWNSEND** possessed with the intent to distribute approximately 4.8 grams of crack cocaine.

dddd)     On or about January 4, 2021, **FORD** was a convicted and possessed with the intent to distribute heroin and cocaine and possessed a Mossberg 5.56 caliber rifle and rounds of .45 caliber ammunition.

eeee)     On or about January 28, 2021, **WILLIAMS-CLARK** distributed approximately 1 gram of heroin.

ffff)     On or about April 11, 2021, **FLOYD**, along with QN/QMG members and associates, and others known and unknown to the Grand Jury, fought with rival gang members at a bar. During the fight, **FLOYD** brandished a knife and stabbed at least two people.

gggg)     On or about April 21, 2021, **WISE** possessed documents and writings that contain QN/QMG contact information and gang indicia at a North Carolina Department of Corrections facility in Marion, North Carolina.

hhhh)     On or about April 21, 2021, **WILLIAMS-CLARK** sold approximately 2.67 grams of heroin.

iiii)     On or about May 27, 2021, **WILLIAMS-CLARK** sold approximately 10 grams of heroin.

jjjj)     On or about June 17, 2021, **WILLIAMS-CLARK** sold

approximately 8 grams of heroin.

kkkk)    On or about July 14, 2021, **WILLIAMS-CLARK** possessed with intent to distribute over two ounces of heroin, and two firearms, a stolen Taurus GZC 9mm handgun and a Glock .40 caliber handgun with a switch that made it capable of being fired as a fully automatic weapon.

llll)    On or about November 30, 2021, QN/QMG gang member **TISDALE** possessed a digital scale, approximately $500 in cash, and possessed with the intent to distribute approximately a 3-gram bag of heroin, a 6-gram bag of heroin, two 3-gram bags of cocaine and an 11-gram bag of methamphetamine. QN/QMG gang member S.A. was driving the car in which **TISDALE** was the front seat passenger.

### NOTICE OF SPECIAL SENTENCING FACTORS

### COUNT ONE:

1. **Murder of J.A. – North Carolina General Statute § 14-17**

On or about December 9, 2015, in the County of Guilford, in the Middle District of North Carolina,

> **JHUSTYN KELVIN MITCHELL,**
> **a.k.a. "J-West,"**
> **a.k.a. "Big Wixked,"**

> **RICKY ALLEN WILLIAMS,**
> **a.k.a. "Raw," and**

> **KENNETH WISE,**
> **a.k.a. "KG,"**
> **a.k.a. "Kenny,"**
> **a.k.a. "Big Psyxho,"**

and others known and unknown to the Grand Jury, did willfully, deliberately, and

28

with premeditation kill J.A., in violation of North Carolina General Statutes Section 14-17(a) and 14-5.2.

2. <u>**Drug Conspiracy – 21 U.S.C. § 846**</u>

Beginning in or about 2012, and continuing to on or about the return date of this Indictment, in the Middle District of North Carolina and elsewhere, the defendants,

> **DARIUS RAYSHAUN KING,**
> a.k.a. "Diddo,"
> a.k.a. "Ditto,"
> a.k.a. "LB,"
> a.k.a. "Lightbread,"
> a.k.a. "Quixk,"
>
> **JHUSTYN KELVIN MITCHELL,**
> a.k.a. "J-West,"
> a.k.a. "Big Wixked,"
>
> **RICKY ALLEN WILLIAMS,**
> a.k.a. "Raw,"
>
> **JACKII DEMETRIUSS FLOYD,**
> a.k.a. "Boss,"
>
> **SAQUAN LANARD ROUSE,**
> a.k.a. "SQ,"
> a.k.a. "Playdoe,"
>
> **KENNETH MALIK WISE,**
> a.k.a. "KG,"
> a.k.a. "Kenny,"
> a.k.a. "Big Psyxho,"
>
> **BRANDON DONTE TIPPS,**
> a.k.a. "Tipps,"
>
> **JAQUAN TYREE WILLIAMS-CLARK,**
> a.k.a. "Jay Jay,"
> a.k.a. "JJ,"

29

> a.k.a. "Psyxho Jay,"
> a.k.a. "Demon,"

**JALEN RASHAD FORD,**
> a.k.a. "Pronto,"

**JEREMY WAYNE HASTY,**
> a.k.a. "Seno,"
> a.k.a. "Seno2x,"

**JOSEPH MORANT TISDALE,**
> a.k.a. "Jody,"
> a.k.a. "Jody Wixked,"

**ROBERT LEE TOWNSEND, JR.,**
> a.k.a. "Jeezy,"

did combine, conspire, confederate, and agree, together and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; 280 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), a Schedule II controlled substance; and five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, thereby constituting a violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(i), (ii), (iii), and 846.

Case 1:22-cr-00075-SEAL Document 20 Filed 03/24/22 Page 30 of 50

## COUNT TWO

### (Conspiracy to Distribute Controlled Substances)
### (21 U.S.C. § 846)

1.    Beginning at least in or about June 2012, and continuing through the date of this Indictment, in the Middle District of North Carolina, and elsewhere, the defendants,

      **DARIUS RAYSHAUN KING,**
          a.k.a. "Diddo,"
          a.k.a. "Ditto,"
          a.k.a. "LB,"
          a.k.a. "Lightbread,"
          a.k.a. "Quixk,"

      **JHUSTYN KELVIN MITCHELL,**
          a.k.a. "J-West,"
          a.k.a. "Big Wixked,"

      **RICKY ALLEN WILLIAMS,**
          a.k.a. "Raw,"

      **JACKII DEMETRIUSS FLOYD,**
          a.k.a. "Boss,"

      **SAQUAN LANARD ROUSE,**
          a.k.a. "SQ,"
          a.k.a. "Playdoe,"

      **KENNETH MALIK WISE,**
          a.k.a. "KG,"
          a.k.a. "Kenny,"
          a.k.a. "Big Psyxho,"

      **BRANDON DONTE TIPPS,**
          a.k.a. "Tipps,"

      **JAQUAN TYREE WILLIAMS-CLARK,**
          a.k.a. "Jay Jay,"
          a.k.a. "JJ,"
          a.k.a. "Psyxho Jay,"

a.k.a. "Demon,"

JALEN RASHAD FORD,
a.k.a. "Pronto,"

JEREMY WAYNE HASTY,
a.k.a. "Seno,"
a.k.a. "Seno2x,"

TERRANCE GERNADO COLEMAN,
a.k.a. "Little T,"
a.k.a. "T-Ruger,"

JOSEPH MORANT TISDALE,
a.k.a. "Jody,"
a.k.a. "Jody Wixked," and

ROBERT LEE TOWNSEND, JR.,
a.k.a. "Jeezy,"

did combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to knowingly and intentionally distribute: (1) one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance; (2) 280 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), a Schedule II controlled substance; (3) five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance; (4) a mixture and substance containing a detectable amount of marihuana, a Schedule I controlled substance; (5) a quantity of a mixture and substance containing a detectable amount of 3,4-Methylenedioxymethamphetamine or MDMA, a Schedule I controlled substance; (6) a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance; (7) a quantity of a

32

mixture and substance containing a detectable amount of N-Ethylpentatylone Hydrochloride, a Schedule I controlled substance analogue as defined in 21 U.S.C. § 802(32), knowing that the substance was intended for human consumption as provided in 21 U.S.C. § 813; and (8) a quantity of mixture and substance containing a detectable amount of hydrocodone, a Schedule II controlled substance, all in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), (ii), (iii), 841(b)(1)(C), 841(b)(1)(D), and 846.

Case 1:22-cr-00075-SEAL Document 20 Filed 03/24/22 Page 33 of 50

## COUNT THREE

### (Attempted Murder in Aid of Racketeering)
### (18 U.S.C. §§ 1959(a)(5) and 2)

1.     Paragraphs 1 through 21 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     At all times relevant to this Indictment, QN/QMG, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose leaders, members, and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.     At all times relevant to this Indictment, QN/QMG, the above-described enterprise, through its leaders, members, and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is,

> a.     acts involving:
>
> > 1. murder, in violation of North Carolina Gen. Stat. §§ 14-17, 14-2.4, 14-2.5, and 14-5.2; and
>
> b.     offenses involving narcotics trafficking, in violation of 21 U.S.C. §§ 841 (possession with the intent to distribute and distribution of controlled substances), 843(b) (use of communication facility in causing or facilitating the commission of felonies under the

34

Controlled Substances Act), and 846 (conspiracy to distribute controlled substances); and

    c.    acts indictable under:

        1.    18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant); and

        2.    18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant).

4.    On or about January 9, 2019, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, the defendant,



aided and abetted by others known and unknown to the Grand Jury, for the purpose of gaining entrance to and maintaining and increasing position in QN/QMG, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder a witness, in violation of North Carolina General Statutes Sections 14-17(a) and 14-2.5.

All in violation of Title 18, United States Code, Sections 1959(a)(5) and 2.

35

## COUNT FOUR

### (Use or Carry a Firearm During and in Relation to a Crime of Violence)
### (18 U.S.C. §§ 924(c) and 2)

1.     On or about January 9, 2019, in County of Guilford, in the Middle District of North Carolina, and elsewhere, the defendant,

aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that being the Attempted Murder in Aid of Racketeering of a witness as charged in Count Three of this Indictment, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

2.     It is further alleged that the defendant, aided and abetted by others known and unknown to the Grand Jury, brandished one or more of said firearms, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii).

3.     It is further alleged that the defendant, aided and abetted by others known and unknown to the Grand Jury, discharged one or more of said firearms, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

All in violation of Title 18, United States Code, Sections 924(c) and 2.

## COUNT FIVE

### (Retaliating Against a Witness, Victim, or Informant)
### (18 U.S.C. §§ 1513(a)(1)(C) and 2)

1.      On or about January 9, 2019, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, the defendant,



aided and abetted by others known and unknown to the Grand Jury, did knowingly and intentionally attempt to murder a witness with the intent to retaliate against that witness for providing to a law enforcement officer information relating to the commission or possible commission of a federal offense.

All in violation of Title 18, United States Code, Sections 1513(a)(1)(B) and 2.

## COUNT SIX

### (Attempted Murder in Aid of Racketeering)
### (18 U.S.C. §§ 1959(a)(5))

1.     Paragraphs 1 through 3 of Count Three of this Indictment are realleged

and incorporated by reference as though fully set forth herein.

2.     On or about September 6, 2019, in the County of Guilford, in the Middle

District of North Carolina, and elsewhere, the defendant,

**SAQUAN LANARD ROUSE,**
**a.k.a. "SQ,"**
**a.k.a. "Playdoe,"**

for the purpose of gaining entrance to and maintaining and increasing position in

QN/QMG, an enterprise engaged in racketeering activity, did knowingly and

intentionally attempt to murder a rival gang member, in violation of North Carolina

General Statutes Sections 14-17(a) and 14-2.5.

All in violation of Title 18, United States Code, Sections 1959(a)(5).

Case 1:22-cr-00075-SEALED Document 20 Filed 08/24/22 Page 38 of 50

## COUNT SEVEN

### (Use or Carry a Firearm During and in Relation to a Crime of Violence)
### (18 U.S.C. §§ 924(c))

1.      On or about September 6, 2019, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, the defendant,

**SAQUAN LANARD ROUSE,**
**a.k.a. "SQ,"**
**a.k.a. "Playdoe,"**

did knowingly and intentionally use and carry  firearms during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that being the Attempted Murder in Aid of Racketeering of a rival gang member charged in Count Six of this Indictment, , in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

2.      It is further alleged that the defendant brandished the firearms, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii).

3.      It is further alleged that the defendant discharged the firearms, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

All in violation of Title 18, United States Code, Sections 924(c).

## COUNT EIGHT

### (Felon in Possession of Ammunition)
### (18 U.S.C. § 922(g)(1))

1.     On or about May 20, 2019, in the County of Guilford, in the Middle

District of North Carolina, the defendant,

   **SAQUAN LANARD ROUSE,**
   **a.k.a. "SQ,"**
   **a.k.a. "Playdoe,"**

did knowingly possess in and affecting commerce ammunition, that is, a round of

9mm caliber Hornaday ammunition, having been convicted of a crime punishable by

imprisonment for a term exceeding one year, and with knowledge of that conviction;

in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## COUNT NINE

### (Felon in Possession of a Firearm)
### (18 U.S.C. § 922(g)(1))

1.    Between on or about September 16, 2019 and on or about November 12, 2019, in the County of Guilford, in the Middle District of North Carolina, the defendant,

**JACKII DEMETRIUSS FLOYD,**
**a.k.a. "Boss,"**

did knowingly possess in and affecting commerce a firearm, that is, a Springfield .45 caliber handgun, having been convicted of a crime punishable by imprisonment for a term exceeding one year, and with knowledge of that conviction, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

<u>**COUNT TEN**</u>

**(Unlawful Possession of a Machinegun)**
<u>**(18 U.S.C. § 922(o))**</u>

1.     On or about July 14, 2021, in the County of Guilford, in the Middle

District of North Carolina, the defendant,

**JAQUAN WILLIAMS-CLARK,**
**a.k.a. "Jay Jay,"**
**a.k.a. "JJ,"**
**a.k.a. "Psyxho Jay,"**
**a.k.a. "Demon,"**

did knowingly possess a machinegun, that is, a Glock 19 fully automatic handgun,

knowing the essential characteristics of the Glock 19 that made it a machinegun as

defined by Section 921(a), in violation of Title 18, United States Code, Sections 922(o)

and 924(a)(2).

## COUNT ELEVEN

### (Possession with Intent to Distribute a Controlled Substance)
### (21 U.S.C. § 841(a)(1))

1.     On or about July 14, 2021, in the County of Guilford, in the Middle District of North Carolina, the defendant,

**JAQUAN WILLIAMS-CLARK,**
            **a.k.a. "Jay Jay,"**
            **a.k.a. "JJ,"**
            **a.k.a. "Psyxho Jay,"**
            **a.k.a. "Demon,"**

did knowingly and intentionally possess with the intent to distribute a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, as defined in Section 812.

All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

Case 1:22-cr-00075-SEALED Document 20 Filed 03/24/22 Page 43 of 50

## COUNT TWELVE

### (Possession of a Machinegun in Furtherance of a Drug Trafficking Crime)
### (18 U.S.C. § 924(c) and § 2)

1.      On or about July 14, 2021, in the County of Guilford, in the Middle District of North Carolina, the defendant,

**JAQUAN WILLIAMS-CLARK,**
a.k.a. "Jay Jay,"
a.k.a. "JJ,"
a.k.a. "Psyxho Jay,"
a.k.a. "Demon,"

did knowingly and intentionally possess a machinegun, that is, a Glock 19 fully automatic handgun, in furtherance of drug trafficking crimes for which he may be prosecuted in a court of the United States, that is, conspiracy to distribute controlled substances, as charged in Count Two of this Indictment, and possession with the intent to distribute heroin, as charged in Count Eleven of this Indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), and 2.

## FORFEITURE ALLEGATIONS

The Grand Jury for the Middle District of North Carolina further finds that:

1.    Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 924(d) and 1963(a), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), in the event of the defendants' convictions on one or more of Counts One through Twelve of this Indictment.

### RICO Forfeiture

2.    Upon conviction of the offense set forth in Count One of this Indictment, the defendants,

> **DARIUS RAYSHAUN KING,**
> a.k.a. "Diddo,"
> a.k.a. "Ditto,"
> a.k.a. "LB,"
> a.k.a. "Lightbread,"
> a.k.a. "Quixk,"
>
> **JHUSTYN KELVIN MITCHELL,**
> a.k.a. "J-West,"
> a.k.a. "Big Wixked,"
>
> **RICKY ALLEN WILLIAMS,**
> a.k.a. "Raw,"
>
> **JACKII DEMETRIUSS FLOYD,**
> a.k.a. "Boss,"
>
> **SAQUAN LANARD ROUSE,**
> a.k.a. "SQ,"
> a.k.a. "Playdoe,"
>
> **KENNETH MALIK WISE,**
> a.k.a. "KG,"

Case 1:22-cr-00075-SEALED Document 20 Filed 03/24/22 Page 45 of 50

a.k.a. "Kenny,"
a.k.a. "Big Psyxho,"

**BRANDON DONTE TIPPS,**
a.k.a. "Tipps,"

**JAQUAN TYREE WILLIAMS-CLARK,**
a.k.a. "Jay Jay,"
a.k.a. "JJ,"
a.k.a. "Psyxho Jay,"
a.k.a. "Demon,"

**JALEN RASHAD FORD,**
a.k.a. "Pronto,"

**JEREMY WAYNE HASTY,**
a.k.a. "Seno,"
a.k.a. "Seno2x,"

**JOSEPH MORANT TISDALE,**
a.k.a. "Jody,"
a.k.a. "Jody Wixked," and

**ROBERT LEE TOWNSEND, JR.,**
a.k.a. "Jeezy,"

pursuant to 18 U.S.C. §1963(a), shall forfeit to the United States:

a.   any interest acquired or maintained in violation of 18 U.S.C. § 1962;

b.   any interest in, security of, claim against, or property or contractual
     right of any kind affording a source of influence over, any enterprise
     which the defendants established, operated, controlled, conducted, or
     participated in the conduct of, in violation of 18 U.S.C. § 1962; and

c.   any property constituting, or derived from, any proceeds obtained,
     directly or indirectly, from racketeering activity in violation of 18 U.S.C.
     § 1962.

46

## Narcotics Forfeiture

2.    Upon conviction of one or both of the offenses set forth in Counts

Two, and Eleven of this Indictment, the defendants,

**DARIUS RAYSHAUN KING,**
           a.k.a. "Diddo,"
           a.k.a. "Ditto,"
           a.k.a. "LB,"
           a.k.a. "Lightbread,"
           a.k.a. "Quixk,"

**JHUSTYN KELVIN MITCHELL,**
           a.k.a. "J-West,"
           a.k.a. "Big Wixked,"

**RICKY ALLEN WILLIAMS,**
           a.k.a. "Raw,"

**JACKII DEMETRIUSS FLOYD,**
           a.k.a. "Boss,"

**SAQUAN LANARD ROUSE,**
           a.k.a. "SQ,"
           a.k.a. "Playdoe,"

**KENNETH MALIK WISE,**
           a.k.a. "KG,"
           a.k.a. "Kenny,"
           a.k.a "Big Psyxho,"

**BRANDON DONTE TIPPS,**
           a.k.a. "Tipps,"

**JAQUAN TYREE WILLIAMS-CLARK,**
           a.k.a. "Jay,"
           a.k.a. "JJ,"
           a.k.a. "Psyxho Jay,"
           a.k.a. "Demon,"

Case 1:22-cr-00075-SEALED Document 20 Filed 03/24/22 Page 47 of 50

**JALEN RASHAD FORD,**
    a.k.a. "Pronto,"

**JEREMY WAYNE HASTY,**
    a.k.a. "Seno,"
    a.k.a. "Seno2x,"

**TERRANCE GERNADO COLEMAN,**
    a.k.a. "Little T,"
    a.k.a. "T-Ruger,"

**JOSEPH MORANT TISDALE,**
    a.k.a. "Jody,"
    a.k.a. "Jody Wixked," and

**ROBERT LEE TOWNSEND, JR.,**
    a.k.a. "Jeezy,"

pursuant to 21 U.S.C. § 853(a), shall forfeit to the United States:

    a.    any property constituting, or derived from, any proceeds obtained,

directly or indirectly, as the result of such offenses; and

    b.    any property used or intended to be used, in any manner or part,

to commit, or to facilitate the commission of, such offenses.

### Firearms Forfeiture

    3.    Upon conviction of one or more of the offenses set forth in Counts One,

Two, Nine, Ten, Eleven , and Twelve of this Indictment, the defendants,

**JACKII DEMETRIUSS FLOYD,**
    a.k.a. "Boss,"

**BRANDON DONTE TIPPS,**
    a.k.a. "Tipps,"

**JALEN RASHAD FORD,**
    a.k.a. "Pronto,"

48

**JHUSTYN KELVIN MITCHELL,**
     **a.k.a. "J-West,"**
     **a.k.a. "Big Wixked,"**

**JOSEPH MORANT TISDALE,**
     **a.k.a. "Jody,"**
     **a.k.a. "Jody Wixked,"**

**JAQUAN TYREE WILLIAMS-CLARK**
     **a.k.a. "Jay,"**
     **a.k.a. "JJ,"**
     **a.k.a. "Psyxho Jay,"**
     **a.k.a. "Demon,"**

pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), shall forfeit to the United States any firearm or ammunition involved in or used in connection with these offenses.

Case Case 1:22-cr-00075-SEAL Document 20 Filed 08/24/22 Page 49 of 50 of 50

## Substitute Assets

4.    If, as a result of any act or omission of the defendants, any of the property described above:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States, pursuant to 18 U.S.C. § 1963(m) and 21 U.S.C. § 853(p), shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above.

DATED: March 21, 2022

SANDRA J. HAIRSTON
United States Attorney

BY:    JOHN M. ALSUP
Assistant United States Attorney

A TRUE BILL:

_____
FOREPERSON

50